**Sallie THOMPSON, Petitioner,**

v.

**The STATE OF SOUTH CAROLINA and The Attorney General of the State of South Carolina, Respondents.**

**Civ. A. No. 83–2870–0T.**

United States District Court,
D. South Carolina,
Columbia Division.

Aug. 31, 1987.

Jeffrey A. Merriam, Greenville, S.C., for petitioner.

T. Travis Medlock, Atty. Gen. of S.C., Columbia, S.C., for respondents.

PERRY, District Judge.

Petitioner, Sallie Thompson, seeks a writ of *habeas corpus* under 28 U.S.C. § 2254. Petitioner is confined in the South Carolina Department of Corrections pursuant to (1) a sentence of life imprisonment on account of her conviction of the offense of accessory before the fact of murder and (2) a concurrent sentence of ten (10) years on account of her conviction of the offense of accessory after the fact of murder. Both sentences were imposed for her conviction in the Court of General Sessions for Spartanburg County, South Carolina following a joint trial of petitioner and her alleged paramour, Dennis McCurry, for the murder of petitioner's husband, Stephen Thompson. Petitioner's conviction has been affirmed by the South Carolina Supreme Court. *State v. Thompson*, 279 S.C. 405, 308 S.E. 2d 364 (1983). Thereafter, the instant petition was filed alleging that petitioner's detention by South Carolina authorities violates the United States Constitution because: (1) the trial judge denied her motion for severance; (2) she was convicted on insufficient evidence; and (3) her conviction and sentence violate the Sixth and Fourteenth Amendments because an extrajudicial statement given prior to trial by her codefendant, Dennis McCurry, which referred to petitioner and implicated her in the homicide, was received as evidence. The respondents have answered the petition, setting forth the facts upon which petitioner was convicted and denying that petitioner was denied any constitutionally protected right. The respondents also submitted a copy of the record of petitioner's trial proceeding and the opinion of the South Carolina Supreme Court affirming

petitioner's conviction. The respondents move for summary judgment in their favor.

Pursuant to 28 U.S.C. § 636(b)(1)(B) and the standing order of this Court pertaining to *habeas corpus* applications, the matter was referred to United States Magistrate Robert S. Carr for review. The Magistrate has filed his report in which, upon review of the trial record and arguments submitted by the parties, he recommends that the petition be denied. Petitioner excepts to the recommendation and urges that, upon all the grounds set forth in her petition, the writ be granted.

## I.

Stephen Thompson was found dead in a wooded area near Spartanburg on September 2, 1981. Subsequent examination by a pathologist revealed that Thompson died of a gunshot wound to the head. Thereafter, McCurry and petitioner were arrested and both gave statements to investigating officers which *inter alia* revealed that McCurry and petitioner were lovers. McCurry's statement admitted that he killed Stephen Thompson. Authorities charged McCurry with murder. Petitioner was charged with the offenses of accessory before and after the fact of murder. The judge denied petitioner's motion for a separate trial and proceeded to try petitioner and McCurry jointly. Extrajudicial statements of both defendants were admitted as evidence over objections by their attorneys. Concluding that the extrajudicial statements of petitioner and McCurry were "interlocking" statements, the trial judge admitted both parties' statements as evidence under the rationale of *Parker v. Randolph,* 442 U.S. 62, 75, 99 S.Ct. 2132, 2140, 60 L.Ed.2d 713 (1979) in which four Justices held that "admission of interlocking confessions with proper limiting instructions conforms to the requirements of the Sixth and Fourteenth Amendment to the United States Constitution." The judge instructed the jury that it could rely on each defendant's statement only to convict the defendant who made the statement. The South Carolina Supreme Court affirmed the trial judge's ruling and agreed that admission of the statements was governed by *Parker v. Randolph, supra.* A review of McCurry's statement and relevant portions of petitioner's statements is appropriate.

## A.

McCurry's statement revealed he, Stephen Thompson, and petitioner were neighbors and friends; that he (McCurry) and petitioner commenced having an "affair;" that he started seeing petitioner often at her home while Stephen Thompson was at work; that he and petitioner started discussing marriage and "we talked about if Steve wasn't around we could get married, because my divorce becomes final November 4, 1981;" that "me and Sallie had talked about getting Steve out of the way;" that he and Steve went to the "Tan Yard" occasionally to shoot their guns; that on the day Stephen Thompson was killed the following occurred:

When he come home I was down at Steve and Sally's house. Me and Sally was sitting at the table. I was drinking tea and she was drinking coca cola.... Before Steve got home, about the time he drove up, Sally asked me if I was going to do it tonight. I thought she was joking. I said yea, I probably will. So Steve come in.... I give my gun case and the shoe dye to Sally. Then he said, 'Well are you ready to go?' I said yea, if you are.... We got in the car and left. But before we left, he got some beer out of the refrigerator.... We went down Highway 29, went up there to that Greentop Service Station and turned left. We went in at the grave yard. We went down through the Tan Yard.... So, he parked the car and we got out. He got the beer out.... he opened up a can and we was standing there talking. Then we thought we heard a woman scream. We both heard it. He looked at me and I looked at him. So I got my gun out of my pocket a .32 H & R and he got his out of his front pocket a .38 S & W.... We walked up on the bridge, up there on the railroad trussel [sic]. Then we walked back to the bridge. Then we stopped on the bridge, just looking down at the water, then a train started coming....

Then, we walked back down to the car. Then, we leaned up against the car and he asked me if I wanted another beer. I said no.... He got off the car and went and sat down on the bank. So I got off the car and walked down there with him.... Then he was still setting there and said, 'Let me see your gun.' ... Then I said, well let me see yours, his gun. Then he was setting there with mine, he was setting there cocking it and letting it back down without shooting it. That's when I said 'Let me see yours.' So he handed it to me and I started doing his the same way. Then I started to stand up and I don't remember shooting him. I don't know if I stumbled, the gun was cocked, I don't know. But I know the gun went off, and Steve was still setting down when the gun went off. It had just spun Steve around. Then I hollered out, 'Steve' two or three times. Then I knew what had happened. I walked up to him, I never did touch him, and said, 'Steve' a couple more times. I thought he was just joking with me. Then I saw he wasn't moving. I throwed the gun down. I got scared and started running.... I walked up the little old main road, leading away from the Tan Yard.... So I run some and walked some. Then I got home. I rung Sally's back doorbell. She come to the door. She had her housecoat and gown on. So I went in there, she opened the door. I said, 'Sally, I shot Steve.' Her eyes filled up, and she said, 'Well, I don't want to know about it.' So, she's been ironing my clothes for me since me and my wife has had a separation. So I had a pair of Levi and shirt down there that she had ironed. So I went and got in the shower well, I asked her if I could take a shower, and she said yes, because the clothes I had on was soaking wet with sweat. She sat on the bed while I was taking a shower.... When I looked up at her, she had been crying.... So we lay on the bed.... We layed there just talking until about 1:30 or 15 till 2:00 a.m..... We made love. Then she dozed off to sleep.... The next thing I remember, the front doorbell rung. It rung about three or four times. Both of us jumped up at the same time. She put her housecoat on. I went to the bedroom window and looked out.... About that time, I heard her daddy say 'It's James, your daddy.' ... So I got in Steve's closet. Then James and the preacher and Chris Hudgens come in, and told her that they had found Steve dead at the Tan Yard. She started crying. Then, somebody used the phone.... Then after they got off the phone, she said, 'I am going to put some clothes on.' Then she come in there and started putting her clothes on, and I tried to raise the window and I didn't know how to raise them windows. Then she raised it. I went home. I didn't know nothing until the next morning....

McCurry's statement was admitted as evidence over petitioner's objection; however, McCurry did not testify.

### B.

Petitioner gave two statements, both of which were admitted as evidence. In her statements, petitioner revealed the adulterous relationship that developed between her and McCurry and the fact that McCurry talked of killing Stephen Thompson. She also revealed that McCurry told her where he intended to commit the act. She acknowledged her "feelings" for McCurry but stated that she had become afraid of him. She described the departure of McCurry and Stephen Thompson from her home on September 1, 1981, McCurry's return later the same night, and that McCurry informed her he had shot Stephen Thompson. She stated that she was afraid of McCurry, but that she slept with him that night at her home. She stated that she was awakened the following morning when her doorbell rang; that her father, a policeman and a minister were at the door; that her father informed her that Stephen Thompson had been found and that he was dead; that her father told her to put on her clothing and he would take her to his home; that she went to her room for that purpose; and that McCurry stepped out of a closet where he was hiding and stated that he had

to leave, raised a window, climbed out of it and left.

## C.

In her appeal to the South Carolina Supreme Court, petitioner argued that the admission of McCurry's statement as evidence during the trial violated her Sixth Amendment right to confront the witnesses against her, relying upon *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Her argument was rejected because, in the Court's view, the statements of petitioner and McCurry tend to support each other. Therefore, the Court sustained the trial judge's conclusion that the statements of petitioner and McCurry were interlocking confessions and that McCurry's statement was properly admitted with appropriate limiting instructions under the procedure approved in *Parker v. Randolph, supra, State v. Thompson,* 279 S.C. at 407, 308 S.E.2d at 366.

## II.

The Sixth Amendment to the Constitution of the United States provides that:

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; *to be confronted with the witnesses against him;* to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence. (Emphasis added).

In *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965) the Supreme Court held that the Confrontation Clause of the Sixth Amendment was applicable to the States under the Fourteenth Amendment. The Court also observed that it "cannot seriously be doubted at this late date that the right of cross-examination is included in the right of an accused in a criminal case to confront the witnesses against him," citing *Kirby v. United States,* 174 U.S. 47, 19 S.Ct. 574, 43 L.Ed.

890 (1899); *Alford v. United States,* 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931); *Greene v. McElroy,* 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959); *In re Oliver,* 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948); and *Turner v. Louisiana,* 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965); and that "[t]here are few subjects, perhaps, upon which this Court and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." 380 U.S. at 404, 405, 85 S.Ct. at 1068.

In *Douglas v. Alabama,* 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965), the Court reversed a conviction because, at trial, the prosecutor read to the jury a confession made by the defendant's accomplice. The accomplice had invoked his privilege against self-incrimination, refusing to answer questions put to him. Therefore, the trial judge declared the accomplice a hostile witness and permitted the prosecutor to read the confession previously given by him, questioning him from time to time, "Did you make that statement?" In response to each such question, the accomplice asserted the privilege and refused to answer. The prosecutor continued reading portions of the statement and asking the same question until the statement had been published in full. In its decision reversing the defendant's conviction, the Supreme Court held that the defendant's "inability to cross-examine [the accomplice] as to the alleged confession plainly denied him the right of cross-examination secured by the Confrontation Clause." *Id.* at 419, 85 S.Ct. at 1077. That holding was based on the understanding that "when one person accuses another of a crime under circumstances in which the declarant stands to gain by inculpating another, the accusation is presumptively suspect and must be subjected to the scrutiny of cross-examination." *Lee v. Illinois,* 476 U.S. 530, ——, 106 S.Ct. 2056, 2062–63, 90 L.Ed.2d 514, 526 (1986). Indeed, since its decision in *Douglas v. Alabama,* the Supreme Court

has treated accomplices' confessions that incriminate defendants as "presumptively unreliable." 476 U.S. at ——, 106 S.Ct. at 2063, 90 L.Ed.2d at 526.

In *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the Supreme Court held that a defendant is deprived of his rights under the Confrontation Clause of the Sixth Amendment when his codefendant's incriminating confession is introduced during his joint trial even if the jury is instructed to consider that confession only against the person who gave it. The Court reasoned that:

> there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. (citations omitted). Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial. Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect, a fact recognized when accomplices do take the stand and the jury is instructed to weigh their testimony carefully given the recognized motivation to shift blame onto others. The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination....

*Id.* at 135–36, 88 S.Ct. at 1627–28.

■ Commenting upon the instructions the trial judge gave the jury to consider the confession only against Evans, the nontestifying codefendant who gave it, the Court states that:

> Despite the concededly clear instructions to the jury to disregard Evans' inadmissible hearsay evidence inculpating petitioner, in the context of a joint trial we cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination.

The effect is the same as if there had been no instruction at all.

*Id.* at 137, 88 S.Ct. at 1628. Thus, where two or more defendants are tried jointly, the pretrial confession of one of them that implicates the others is not admissible against the others unless the confessing defendant waives his Fifth Amendment rights and subjects himself to cross-examination. *See Douglas v. Alabama, supra.*

Later, in *Parker v. Randolph*, 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979) the Court again considered the question whether a nontestifying codefendant's confession was admissible in a joint trial. In *Parker*, each of the jointly tried defendants had himself confessed, his own confession was introduced against him, and his confession recited essentially the same facts as those of his nontestifying codefendants. Four Justices found no Sixth Amendment violation from the admission of the codefendants' confessions. The Court understood *Bruton v. United States* to hold that the Confrontation Clause is violated only when introduction of a codefendant's confession is "devastating" to the defendant's case and expressed the view that when the defendant has confessed, "[his] case has already been devastated," 442 U.S. at 75, n. 7, 99 S.Ct. at 2140 n. 7, so that the codefendant's confession "will seldom, if ever, be of the 'devastating' character referred to in *Bruton*," and impeaching that confession on cross-examination "would likely yield small advantage." *Id.* at 73, 99 S.Ct. at 2139. The other four participating Justices disagreed, subscribing to the view expressed by Justice Blackmun that while introduction of the defendant's own interlocking confession might, in some cases, render the violation of the Confrontation Clause harmless, it could not cause introduction of the nontestifying codefendant's confession not to constitute a violation. *Id.* at 81, 99 S.Ct. at 2143. (Justice Blackmun alone went on to find that the interlocking confession did make the error harmless in the case before the Court, thereby producing a majority for affirmance of the convictions. *Id.* at 80–81, 99 S.Ct. at 2142–43).

In *Cruz v. New York*, 481 U.S. ——, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987), a case

bearing directly on this one, the Court again considered the question whether *Bruton* applies where the defendant's own confession, corroborating that of his codefendant, is introduced against him. In *Cruz*, two brothers, Eulogio Cruz and Benjamin Cruz, were indicted and tried jointly for the murder of a service station attendant. Over Eulogio's objection, the trial judge allowed the prosecutor to introduce Benjamin's videotaped confession which contained incriminating references to Eulogio to the effect that he (Benjamin), Eulogio and two other men had robbed the gas station and that he (Benjamin) killed the attendant after the attendant shot Eulogio. Another witness, Norberto, testified that Eulogio confided to him that he (Eulogio) and Benjamin had gone to a Bronx gas station the night before, intending to rob it; that Eulogio and the attendant struggled; that the attendant shot Eulogio in the arm; and that Benjamin had killed him. Thus, the jury heard incriminating statements by the defendant Eulogio Cruz and from Benjamin Cruz, who did not testify. The jury convicted both defendants. The New York Court of Appeals affirmed Eulogio's conviction, adopting the reasoning of the plurality opinion in *Parker* that *Bruton* did not require the codefendant's confession to be excluded because Eulogio had himself confessed and his confession "interlocked" with Benjamin's.

Rejecting the view of the plurality in *Parker v. Randolph, supra,* the Court held that "where a nontestifying codefendant's confession incriminating the defendant is not directly admissible against the defendant ... the Confrontation Clause bars its admission at their joint trial, even if the jury is instructed not to consider it against the defendant, and even if the defendant's own confession is admitted against him." 481 U.S. at ——, 107 S.Ct. at 1719, 95

L.Ed.2d at 172. The Court further observed that "[o]f course, the defendant's confession may be considered at trial in assessing whether his codefendant's statements are supported by sufficient 'indicia of reliability' to be directly admissible against him (assuming the 'unavailability' of the codefendant) despite the lack of opportunity for cross-examination, *see Lee, supra* 476 U.S. at [——], 106 S.Ct. at [2061]; *Bruton,* 391 U.S. at 128 n. 3, 88 S.Ct. at 1623 n. 3, and may be considered on appeal in assessing whether any Confrontation Clause violation was harmless, *see Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969)." [1]

■ Thus, *Parker v. Randolph, supra,* upon which the trial judge, the South Carolina Supreme Court, and this Court's Magistrate have all relied in approving admission of McCurry's statement, has now been rejected by the United States Supreme Court. *Cruz v. New York, supra.* Where, as in this case, a nontestifying codefendant's confession incriminating the defendant is not directly admissible against the defendant, the Confrontation Clause bars its admission at their joint trial, even if the jury is instructed not to consider it against the defendant, and even if the defendant's own confession is admitted against him. Admission of McCurry's statement during the joint trial of McCurry and petitioner for the murder of Stephen Thompson violated petitioner's right to be confronted by the witnesses against her. *Cruz v. New York, supra; Bruton v. United States, supra.* Moreover, I am unable to agree that admission of McCurry's statement as evidence was harmless. McCurry's statement described in graphic detail the events before, during and after Stephen Thompson was killed; and it contained incriminating references to petition-

---

1. In *Richardson v. Marsh,* 481 U.S. ——, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987), the Court stated that it continues to apply *Bruton* where its rationale validly applies, citing *Cruz v. New York, supra,* and considered whether *Bruton* requires exclusion of a nontestifying codefendant's confession at a joint trial when the codefendant's confession is redacted to omit any reference to the defendant but the defendant is

nonetheless linked to the confession by evidence properly admitted against her at trial. The Court held "the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with proper limiting instruction where, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to her existence." 481 U.S. at ——, 107 S.Ct. at 1709, 95 L.Ed.2d at 188.

er, some of which are not contained in her statements.

## III.

Upon consideration of the matter, the petition of Sallie Thompson for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254 is hereby granted. Respondents shall release petitioner from custody unless, within sixty (60) days from the date hereof, the State of South Carolina elects to retry her.

IT IS SO ORDERED.